Gabrielli, J.
.Special Term has declared unconstitutional a weighted voting plan adopted by the Board of Supervisors of *236 Nassau County; and we are presented with the question whether the board has overcome the infirmity of a prior plan it had proposed.
In Franklin v. Mandeville (26 N Y 2d 65) this court rejected the weighted voting plan under which the Board of Supervisors (board) had operated for well over 30 years primarily for the reason that Supervisors representing some 57% of the county’s population located in the Town of Hempstead could east but 49.6% of the board’s vote. It was further determined that, within six months from the public announcement of the results of the 1970 census, the board was to promulgate an acceptable plan. Ultimately, after delays beyond the six-month limit not here pertinent, plaintiffs, residents, taxpayers and qualified voters of Nassau County, moved at Special Term for an order appointing a nonpartisan commission to prepare a plan then to be implemented by the court. In September, 1972, the board, composed of four Republicans and two Democrats, unanimously adopted Local Law No. 13-1972, which provided a new weighted voting system. The board cross-moved for approval of this plan.
Special Term ruled that the plan contained the samé fault for which it was previously rejected; that it did not otherwise meet criteria set down by this court in other cases; and that' weighted voting was per se unacceptable as a matter of law. Special Term refused to appoint a nonpartisan commission and gave the board 60 days to devise an acceptable plan. Under the rationale of this decision, of course, the plan would either have to be based on the multi-member or single-member district concept. The board appeals directly here under CPLR 5601 (subd. [b], par. 2).
The new plan emerged after a computer analyst reviewed over 2,000 different combinations of votes and voting—r this, in an effort to conform to this court’s pronouncements on weighted voting made in Iannucci v. Board of Supervisors of County of Washington (20 N Y 2d 244) where, inter alia, it was held that “ voting power ” could only be equalized properly through computer mathematical analysis. One hundred possibilities were given the board’s attorney and of these he submitted “ a half dozen or so ” for the board’s consideration. The plan selected provides for a total of 130 votes to be distributed among the *237 six Supervisors, as follows: Each of the two Supervisors elected at large from the Town of Hempstead, 35; the Oyster Bay Supervisor, 32; the North Hempstead Supervisor, 23; the Long Beach Supervisor, 3; and the Glen Cove Supervisor, 2. Since the Town of Hempstead contains some 56% of the county’s population, and its two Supervisors possess combined voting power corresponding to 55% there is minimal deviation off the ideal, >of but -1.6. Oyster Bay with some 23% of the population has 20.370% voting power through its Supervisor, a deviation of -2.7. North Hempstead 16.5% population, 13% voting power, -3.5 deviation. Long Beach 2.3% population, 5.6% voting power, +3.3 deviation. Glen Cove 1.8% population, 5.6% voting power, +3.8 deviation.
Thus, the smaller communities are superenfranchised to a somewhat greater extent than the larger communities are disenfranchised. But the range of deviation is only 7.3% and the plan fits comfortably within the intendment of Iannucci v. Board of Supervisors of County of Washington (20 N Y 2d 244, supra) as affected by subsequent case law. The problem in lannucci was that the smaller units of local government were not accorded decisive voting power under those weighted voting plans which would approximate the power they would project through their representatives in a legislative body which did not employ weighted voting. With regard to the plan here under consideration, and in light of the voting power combinations worked out by the computer analyst, the superenfranchisement of the smaller unit's in this case satisfies lannucci in this respect.
It was also noted in lannucci that a weighted voting plan would be invalid if over 50% of the population werp represented by a legislator entitled to cast over 50% of the votes for then, in reality, he would possess 100% voting power, at least as to measures requiring a majority vote for passage. The instant plan would violate that injunction, of course, were it not for its provision that for passage of a measure requiring a majority 71 and not 66 votes are required; and for measures requiring a two-thirds vote,. 92, and not 87, votes are required. Thus, while the Town of Hempstead Supervisors together possess 70 votes, more than a majority of the total 130, they cannot have 55% voting power which would ordinarily be 100% voting power in a “ pure majority” situation. This admittedly artificial *238 voting requirement, in reality, gives the Town of Hempstead a greater disenfranchisement than would otherwise be the case in certain voting combinations.
This is precisely the point which caused our rejection of the former plan, which, although based on different scales and values, contained the same sort of bar preventing the Town of Hempstead Supervisors from having 100% voting power. At the time that decision was handed down, the preachment was that one man, one vote had to be applied at all levels of government with mathematical certitude and this court was concerned with the scope of Hempstead’s disenfranchisement. In the intervening years this stricture has been considerably softened with respect to local level government and this reshaping is most desirable, as demonstrated in the case at bar.
The problem here is somewhat unique. In none of the literature (see Johnson, An Analysis of Weighted Voting as Used in Reapportionment of County Governments in New York State, 34 Albany, L. Rev. 1 [1969]; Banzhaf, Weighted Voting Doesn’t Work: A Mathematical Analysis, 19 Rutgers L. Rev. 317 [1965]), or the cases thus far, has the situation arisen where, as here, one of the units of local government, in a county seeking to employ weighted voting, alone includes a majority of the county’s total population. It is argued that for this reason the principle of weighted voting is impossible of application because in order precisely to satisfy the principle of one man, one vote the largest unit’s voting power ought to be commensurate with the size of its population, but that to achieve that would be to violate the lawmcci ban on 100% voting power.
We would be extremely reluctant to reject this weighted voting plan, approved unanimously by a bipartisan board, and force the county into multi-member districting. It has been argued to us, without material opposition, that the small board, composed of the unit Supervisors, is the most efficient form of government, and has proved to be such over the years. It is also pointed out, again without serious question, that multimember districting would necessitate a very large legislative body (estimated at 55 members), because of the central problem— the huge disparity between the size of the population in the Town of Hempstead, and the other units which even among themselves are grossly disproportional in population size. Thus, *239 to preserve unit boundary lines and the concomitant efficiency in the rendition of local services, without creating a monstrous legislative body, virtually necessitates a weighted voting system which can approach as closely as possible the one man, one vote principles discussed in Iannucci.
We now know that if complete mathematical perfection is not achieved at the local level there need be no reason to discard an apportionment plan solely for that reason. It has now become clear that a fair measure of superenfranchisement and disenfranchisement can be tolerated for the sake of the preservation of local units.
In Abate v. Mundt (25 N Y 2d 309) this court approved a multi-member districting plan over the argument of excessive deviation. Judge Bubke noted that the one man, one vote principle is treated differently at the three levels of legislative apportionment, i.e., at the congressional, State and local levels; that different considerations obtain at the local level and that‘1 ‘ variations from a pure population standard might be justified by such state policy considerations as the integrity of political subdivisions, the maintenance of compactness and contiguity in legislative districts or the recognition of natural or historical boundary lines ’ ” (25 N Y 2d, at p. 316, quoting from Swann v. Adams, 385 U. S. 440, 444, emphasis added by Judge Bubke). Abate was affirmed in the Supreme Court where it was stated that slightly greater percentage deviations could be tolerated for local apportionment schemes. “ Of course, this Court has never suggested that certain geographic areas or political interests are entitled to disproportionate representation. Bather our statements have reflected the view that the particular circumstances and needs of a local community as a whole may sometimes justify departures from strict equality” (403 U. S. 182, 185). In a companion case, Whitcomb v. Chavis (403 U. S. 124), involving the reapportionment of Marion County, Indiana, as a mqlti-member district for the election of State representatives and senators, the court declared multi-member districts not to be inherently unconstitutional and approved the plan over objection that it discriminated against concentrations of Negro voters. The Abate scheme held a 12% variation, and Justice Hablan, in a concurring opinion, remarked upon the court’s declining enthusiasm for the application of strict standards to local situations.
*240 In Mahan v. Howell (410 U. S. 315) the plan involved apportionment of the State of Virginia for the election of State delegates and senators. Basic to the plan was the preservation of political subdivision boundary lines and this resulted in a “ maximum percentage variation from [the] ideal” of 16.4%. Justice Behítquist specifically approved the idea that more “flexibility” was constitutionally permissible with respect to State legislative reapportionment than in congressional redistricting, stating: ‘ ‘ Thus, whereas population alone has been the sole criterion of constitutionality in congressional redistricting * * # broader latitude has been afforded the States * * *. The dichotomy between the two lines of cases has consistently been maintained. In Kirkpatrick v. Preisler [394 U. S. 526], for example, one asserted justification for population variances was that they were necessarily a result of the State’s attempt to avoid fragmenting political subdivisions by drawing congressional district lines along existing political subdivision boundaries. This argument was rejected in the congressional context. But in Abate v. Mundt, 403 U. S. 182 (1971), an apportionment for a county legislature having a maximum deviation from equal-, ity of 11.9% was upheld in the face of an equal protection challenge, in part because New York had a long history of maintaining the integrity of existing local government units within the county.” (410 U. S., at p. 322)[1].
Finally, in Matter of Schneider v. Rockefeller (31 N Y 2d 420) this court approved the new State legislative plan, Judge Jasek’s opinion including dictum especially pertinent in the case now before us. Petitioners argued in Schneider that Abate v. Mundt (25 N Y 2d 309, affd. 403 U. S. 182, supra) had softened the *241 principles of Reynolds v. Sims (377 U. S. 533), the landmark ease on State legislative reapportionment, hut the court found Abate v. Mundt applicable only to units of local government, stating: “While we would agree that Abate perhaps signals a reappraisal by the court of apportionment standards for local government, we think that the authorities amply support the choice of maximum population equality as a guiding principle in redistricting and reapportioning the State Legislature ” (31 N Y 2d, at p. 428). Footnote 3 to the Schneider opinion states: “ 3. There may be good reason for treating local government apportionment as a distinct problem. As the court noted in Abate, local legislative bodies have fewer members and local legislative districts have fewer voters than their State and national counterparts. Thus, it may be more difficult to devise apportionment plans that comply with numerical equality at the local level. Furthermore, there are over 80,000 units of local government serving various functions. A certain flexibility may, therefore, be desirable to facilitate intergovernmental co-operation at this level. (See, e.g., Avery v. Midland County, 390 U. S. 474, 485.) ”
That footnote distills the more recent thinking that the one man, one vote ideal, while not to be abandoned at the local level, can at least be tempered to meet local exigencies and preserve boundary lines. The plan before us comports with the standards set forth in Iannucci v. Board of Supervisors of County of Washington (20 N Y 2d 244, supra) as closely as is possible, given the unique situation created by Hempstead’s size with the disparities in population among the other units. The fact that the plan still carries the problem found decisive in Franklin v. Mandeville (26 N Y 2d 65, supra) should not constitute a continuing bar to validation. It has been demonstrated that the standards applied to our former decision have been very significantly altered. The more thought that was given to the local situations, the more it became apparent it was more desirable to preserve traditional unit representation even if that led to a slight degree of disparity in voting power. The integration of local taxing and local services depends on preservation of unit boundary lines and unit representation. To merge these units into one another for the sake of creating mathematically equal districts would be to sacrifice practicality for an abstrae *242 tion; a situation which surely was never contemplated or briefed in Reynolds v. Sims (377 U. S. 533, supra). Representation at the State and congressional levels can be arranged on a more precise mathematical basis because the responsibilities of the representatives are not so specifically tied to the management of local affairs.
The plan before us has been “ computerized ” as suggested by the Iannucci requirement and moves close to one man, one vote without granting Hempstead 100% voting power. The total deviation is 7.3%, a tolerable figure within the contemplation of Abate and other recent cases (e.g., 16.4% in the Mahan case, 410 U. S. 315, supra, and that at the State level). The Hempstead Supervisors’ voting power is such that, assuming they wish to pass a measure requiring a majority, they need only one other Supervisor’s vote. It would seem that together they can defeat any such measure without further aid since the rest of the Supervisors together do not have 71 votes among them. Thus, the citizens of Hempstead certainly have a weighty voice in this legislative process, while at the same time, the citizens of the other units cannot always be overwhelmed by that power. In other words, the citizens of the smaller units have decisive power in a significant share of the possible voting combinations.
In no way are we suggesting that the one man, one vote principle be abandoned at the local level. We will continue to insist that this ideal be the goal and that Iannucci be the guide. We merely conclude that the plan before us meets a sufficient standard when measured against the law as it now is with regard to local government. This law has assumed a desirable practicality because it allows for flexibility—something which, at least prior to Abate v. Mundt (25 N Y 2d 309, affd. 403 U. S. 182, supra) was lacking.
We hold there is no constitutional infirmity in the plan adopted by Local Law No. 13-1972.
The judgment should be reversed, without costs, and appellants ’ cross motion should be granted.
Chief Judge Fuld and Judges Burke, Breitel, Jasek and Jokes concur; Judge Wachtler taking no part.
Judgment reversed, etc.

. In two very recent cases it was held that special-purpose units of government such as water and sewage districts could operate outside strict one man, one vote principles because they affected “1 definable groups of constituents more than other constituents ’ ”, and that certain groups could thus have disproportionate voting power (Salyer Land Co. v. Tulare Water Dist., 410 U. S. 719; Associated Enterprises, Inc. v. Toltec Dist., 410 U. S. 743). These decisions do not specifically extend to units of general local government apportionment such as we find in the instant case. There may be, however, further indication in these cases that the Supreme Court does not demand strict one man, one vote principles at the local level.