**ROXBURY TAXPAYERS ALLIANCE, Susan E. Moore, Edward V.S. Moore, and Elsa MacDonald, Plaintiffs–Appellants,**

v.

**DELAWARE COUNTY BOARD OF SUPERVISORS, Defendant–Appellee.**

**No. 684, Docket 95–7545.**

United States Court of Appeals, Second Circuit.

Argued Dec. 21, 1995.

Decided March 21, 1996.

---

43

Herbert Jordan, Roxbury, New York (Randlett Walster, Jordan & Walster, on the brief), for Plaintiffs–Appellants.

Richard B. Spinney, County Attorney, Stamford, New York, for Defendant–Appellee.

Before: KEARSE, MAHONEY, and PARKER, Circuit Judges.

KEARSE, Circuit Judge.

Plaintiffs Roxbury Taxpayers Alliance ("Roxbury Alliance" or "Alliance") *et al.* appeal from a judgment of the United States District Court for the Northern District of New York, Thomas J. McAvoy, *Chief Judge,* dismissing their complaint under 42 U.S.C. § 1983 (1994), alleging that the method of electing members of defendant Delaware County Board of Supervisors (the "Board") violates their rights under the Equal Protection Clause of the Fourteenth Amendment. The district court denied a motion by plaintiffs for summary judgment and instead granted summary judgment dismissing the complaint on the grounds that most of the plaintiffs lacked standing and that the undisputed facts showed that the challenged system provides fair and effective representation for all Delaware County citizens. Plaintiffs pursue their equal protection claim on appeal. Finding no merit in their contentions, we affirm.

## I. BACKGROUND

The facts do not appear to be in dispute. Delaware County ("Delaware" or the "County"), organized by the New York State legislature in 1797, is one of New York's 62 counties and covers an area of 1460 square miles in the central region of the State. According to the 1990 census, the County has a total population of 47,225, spread over 19 towns that have disparate numbers of residents. The smallest town is Bovina with a population of 550; the largest is Sidney with a population of 6,667. The mean population of Delaware's towns is 2,486. The County is governed by its 19–member Board of Supervisors, with each member (or "Supervisor") elected by the citizens who reside in his or her town.

The plaintiffs in the present action are Roxbury Alliance, an unincorporated association organized to monitor compliance by County officials with local laws; Susan E. Moore and Edward V.S. Moore (the "Moores"), who are residents of the Town of Middletown (population 3,406); and Elsa MacDonald who is a resident of Sidney. Plaintiffs contended that the County's use of single-member voting districts of disparate populations impermissibly dilutes the votes of those citizens residing in towns with larger-than-average populations. They sought a declaratory judgment that the system of electing one representative from each town violates the Equal Protection Clause and an injunction requiring reapportionment of the voting districts.

The Board defended on the ground that, notwithstanding the single-member voting districts of disparate populations, there is no disparity in County citizens' voting power because since 1976 the Board has used a computer-projected method of weighted voting that entitles each Supervisor to a number of votes that closely approximates the relative population of his of her voting district, based on the most recent census. Local Law No. 4, which went into effect in January 1992, provides that a total of 3,480 votes are available for proposed County legislation whose passage by the Board requires the affirmative vote of a simple majority; a total of 2,428 votes are available if a two-thirds majority is needed; and a total of 2,244 votes are available if a three-fifths majority is needed. Local Law No. 4 allocates the available votes, for each type of vote taken by the Board, to the Board members in proportion to their respective towns' populations based on the 1990 census.

For example, as to proposed County legislation needing the affirmative vote of a simple majority, the Supervisor representing Bovina (population 550) is allocated 39 votes, which he or she must cast as a bloc; the Bovina Supervisor has, instead, 28 votes when a two-thirds majority is needed, and 27 votes when a three-fifths majority is required. In comparison, the Supervisor representing Sidney (population 6,667) has 468 votes when a simple majority is needed, 358 votes when the affirmative vote of two-thirds of the Board's total votes is required, and 308 votes when a three-fifths majority is needed.

Thus, where a resolution requires a simple majority of votes for passage, the representative elected by Bovina, which has approximately 1.17% of the County's total population, controls 39 of 3480 votes, or 1.12%; the representative from Sidney, which has some 14.12% of the County's population, is entitled to cast 13.45% of the total number of votes. In sum, as plaintiffs acknowledged, "[w]hen voting, the board uses a weighting system under which each member casts a vote which is essentially proportionate to the population of his or her town." (Plaintiffs' Statement Pursuant to Local Rule 10(j) in support of their motion for summary judgment ("Plaintiffs' Rule 10(j) Statement") ¶ 9.)

Based on the undisputed facts, plaintiffs moved for summary judgment, arguing that the Equal Protection Clause requires that local legislators be elected from districts of roughly equal population and that the County's desire to preserve the integrity of town boundaries could not override that constitutional requirement. Plaintiffs contended that weighted voting was insufficient to meet this standard in light of the Supreme Court's decision in *New York City Board of Estimate v. Morris,* 489 U.S. 688, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989) ("*Morris II* "), *aff'g* 831 F.2d 384 (2d Cir.1987) ("*Morris I* "). Plaintiffs also contended that weighted voting was insufficient to assure them equal representation because, given the Supervisors' equal ability to participate in, *inter alia,* floor debates and committee work, Board members from less populous towns had disproportionate ability to influence County legislation.

The Board opposed summary judgment, contending, *inter alia,* that Delaware's present apportionment plan met the federal constitutional standard of "one person, one vote" because voting power on the Board was distributed among districts in proportion to their respective populations. The Board argued that Local Law No. 4 preserved the ability of towns comprising a majority of the County's population to pass legislation, while maintaining the Board's small size and assuring that each town, no matter how small, has a proportionate share of representation. The County also noted that its plan conformed to New York State's Municipal Home Rule

Law, which authorizes a county to adopt a voting plan that (a) "provide[s] substantially fair and effective representation for the people of the local government" and (b) includes "[r]epresentation areas [that are] of convenient and contiguous territory in as compact form as practicable." N.Y. Mun. Home Rule Law §§ 10.1.a(13)(a)(iii) and (iv) (McKinney 1994). The Board submitted the affidavit of the Supervisor of the Town of Davenport (population 2,438) in support of, *inter alia,* the Board's contentions that the present system provides greater efficiency than would be allowed by the reapportionment that plaintiffs' request, and that it gives no Supervisor the power to prevent a Board vote on any proposed legislation.

In a Memorandum–Decision & Order dated May 13, 1995, reported at 886 F.Supp. 242, the district court denied plaintiffs' motion for summary judgment and granted judgment for the County as a matter of law. Citing *League of Women Voters v. Nassau County Board of Supervisors,* 737 F.2d 155 (2d Cir.1984) ("*League of Women Voters* ") (§ 1983 action available only to those who can assert infringement of a "personal" constitutional right), *cert. denied,* 469 U.S. 1108, 105 S.Ct. 783, 83 L.Ed.2d 778 (1985), the court ruled that Roxbury Alliance lacked standing to bring the present action because the rights asserted were not personal to the Alliance. The court also ruled that the Moores lacked standing because they resided in a voting district, Middletown, that had 7.21% of the County's total population and was allocated approximately 7.30% of the Board's weighted votes, and hence was not underrepresented under the County's apportionment plan.

Turning to the merits, the district court noted that prior to the *Morris* cases, this Court, in *League of Women Voters,* 737 F.2d at 167, had clearly held that weighted-voting plans were not *per se* unconstitutional. The district court noted that "*Morris* was not a true weighted voting case," 886 F.Supp. at 249, and that *Morris II* had

> affirmed the standard articulated in *Reynolds [v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ], that the relevant inquiry when testing the constitutionality

of apportionment plans is that the vote of any citizen must be approximately equal in weight to that of any other citizen, and that the goal is to provide fair and effective representation to all citizens.

886 F.Supp. at 252. The district court stated that

the [*Morris II*] Court chose to focus the relevant inquiry on the comparative "weight" of the citizens' votes. Had the Court intended to rely exclusively on districts of equal population, it would surely have based the relevant inquiry simply on the population of each district.... Thus, while the Supreme Court may prefer electoral districts of equal population, local governments still have the flexibility to organize themselves in ways that meet the needs of the local communities, as long as they are within reasonable constitutional parameters.

*Id.* at 251.

The court found that the constitutional standard was met in the present case. It rejected plaintiffs' method of calculating the County's deviation from the mean population, in which plaintiffs added the percent by which Sidney's population exceeds the mean to the percent by which the mean exceeds Bovina's population; the court found that this did not provide "the relevant measure of whether the votes of the citizens of Delaware County are weighted equally." *Id.* at 253. Rather, the court concluded that a comparison of the "percentage of actual votes allocated to each representative against the percentage of the county population in each district" more accurately measured the relative voting power of the members of the Board. *Id.* Using this approach, the court noted that "the most over represented town is Andes, with 2.737% [*sic:* 2.734% ] of the total population and 2.988% of the votes, producing a deviation of 0.25 ... [, and] the most underrepresented town is Sidney, with 14.117% of the total population and 13.448% of the total votes, producing a deviation of − 0.67." *Id.* at 253–54. Thus, the "total deviation is less than 1% (0.92) from population equality," a number "clearly within the permissible constitutional range." *Id.* at 254. The court noted that

[t]he system of apportioning votes to town supervisors in proportion to the town population is relatively easy to understand, and .... is based on real votes and real populations, rather than on a theoretical model of voting coalitions. Most importantly, no single town has close to 50% of the votes, and no supervisor can therefore dominate the board. As a result, the weighted voting plan relies on the fundamental democratic practice of having simple majorities decide the great majority of its votes, and conventionally calculated "supermajorities" decide on a small number of particularly important measures. No single group of voters are permanently underrepresented in proportion to their numbers, and even the smallest political unit has a meaningful say in the decisions of the board.

*Id.* Noting plaintiffs' concession that "[w]hen voting, the board uses a weighting system under which each member casts a vote which is essentially proportionate to the population of his or her town" (Plaintiffs' Rule 10(j) Statement ¶ 9), the court concluded that the County's system of allocating weighted votes among the members of its Board of Supervisors assured both quantitative and qualitative equality of representation.

Judgment was entered dismissing the complaint, and this appeal followed.

## II.  DISCUSSION

On appeal, plaintiffs pursue their contention that the County's weighted-voting system violates the individual plaintiffs' rights to equal protection. We conclude that their contentions are without merit substantially for the reasons stated by the district court.

Preliminarily, we note that plaintiffs have not argued that the district court erred in ruling that the Alliance lacks standing in the present suit. Accordingly, that ruling will not be disturbed, *see, e.g., Day v. Morgenthau*, 909 F.2d 75, 76 (2d Cir.1990), *cert. denied*, 506 U.S. 821, 113 S.Ct. 71, 121 L.Ed.2d 37 (1992); and given the unchallenged dismissal for lack of standing, the Alliance has no standing on this appeal to

challenge the district court's ruling on the merits. With respect to the Moores, there is no dispute that their town has 7.21% of the County's residents and that the weighted-voting system gives their representative 7.30% of the Board's total votes. To have standing, a plaintiff has the burden of showing that he or she suffers an "injury in fact" that is "fairly ... trace[able] to the challenged action of the defendant." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (internal quotation marks omitted). The district court correctly ruled that since the Moores reside in a town that is slightly overrepresented on the Board, they have shown no such injury to themselves and hence they lack standing. *See, e.g., League of Women Voters,* 737 F.2d at 161. Accordingly, we turn to the merits of the case with respect to MacDonald, the plaintiff who has standing.

In *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the Supreme Court held that "as a basic constitutional standard, the Equal Protection Clause requires that the seats in ... [a] state legislature must be apportioned on a population basis." *Id.* at 568, 84 S.Ct. at 1385. The Court reasoned that

> if a State should provide that the votes of citizens in one part of the State should be given two times, or five times, or 10 times the weight of votes of citizens in another part of the State, it could hardly be contended that the right to vote of those residing in the disfavored areas had not been effectively diluted.... The resulting discrimination against those individual voters living in disfavored areas is easily demonstrable mathematically. Their right to vote is simply not the same right to vote as that of those living in a favored part of the State. Two, five, or 10 of them must vote before the effect of their voting is equivalent to that of their favored neighbor. Weighting the votes of citizens differently, by any method or means, merely because of where they happen to reside, hardly seems justifiable.

*Id.* at 562–63, 84 S.Ct. at 1382. The Court stated that "[p]opulation is, of necessity, the starting point for consideration and the controlling criterion for judgment in legislative apportionment controversies." *Id.* at 567, 84 S.Ct. at 1384. The Court's ultimate conclusion was that "an individual's right to vote ... is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State." *Id.* at 568, 84 S.Ct. at 1385.

■ These principles apply to local as well as state governments. *See, e.g., Morris II,* 489 U.S. at 692–93, 109 S.Ct. at 1437–38; *Abate v. Mundt,* 403 U.S. 182, 185, 91 S.Ct. 1904, 1906, 29 L.Ed.2d 399 (1971); *Hadley v. Junior College District,* 397 U.S. 50, 58, 90 S.Ct. 791, 796, 25 L.Ed.2d 45 (1970) ("[T]he guarantee of equal voting strength for each voter applies in all elections of governmental officials."); *Avery v. Midland County,* 390 U.S. 474, 481, 88 S.Ct. 1114, 1118, 20 L.Ed.2d 45 (1968).

■ When representatives are elected from districts of equal populations, each citizen enjoys the right to his or her fair share of representation on the body comprising those representatives:

> "[t]he personal right to vote is a value in itself, and a citizen is, without more and without mathematically calculating his power to determine the outcome of an election, shortchanged if he may vote for only one representative when citizens in a neighboring district, of equal population, vote for two; or to put it another way, if he may vote for one representative and the voters in another district half the size also elect one representative.

*Morris II,* 489 U.S. at 698, 109 S.Ct. at 1440. As was stated in *Morris I,* the emphasis on equality of population is designed to protect each voter's "share" of representation on the governmental body. The "one person, one vote" standard "forbids arrangements under which the voting strength of voters in one or more small districts outweighs the voting strength of voters in one or more large districts and district representatives exercise substantial voting power within the elected body." 831 F.2d at 394 (Newman, *J.,* concurring).

■■ The Constitution may, however, tolerate a degree of deviation from strict population equality in elections where such deviation is necessary to meet changing local needs. As the Court explained in *Hadley,* "[v]iable local governments may need many innovations, numerous combinations of old and new devices, great flexibility in municipal arrangements to meet changing urban conditions." 397 U.S. at 59, 90 S.Ct. at 796 (internal quotation marks omitted). Where such deviation from mathematical equality is more than *de minimis,* a court is to scrutinize the state interests offered to justify the deviation, evaluating "the character as well as the degree of deviations from a strict population basis." *Reynolds,* 377 U.S. at 581, 84 S.Ct. at 1392. Considerations such as a desire to preserve local political subdivisions, particularly when applied "in a manner free from any taint of arbitrariness or discrimination," *Brown v. Thomson,* 462 U.S. 835, 843, 103 S.Ct. 2690, 2696, 77 L.Ed.2d 214 (1983) (internal quotation marks omitted), and accompanied by a long tradition of preserving those boundaries, *see id.,* are among the factors that have been recognized as warranting deviation from strict population-based election of representatives. *See, e.g., id.; Abate v. Mundt,* 403 U.S. at 186–87, 91 S.Ct. at 1907–08; *cf. Reynolds,* 377 U.S. at 578, 84 S.Ct. at 1390 ("A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme.").

■ When a departure from voting on a strict population basis is necessary, the use of a system that weights the votes of the elected representatives may provide the voters of a given district with a degree of representation on the governing body that is proportionate to the percentage that the district's population bears to the population of the political unit as a whole. In *League of Women Voters,* we rejected a contention that weighted voting was *per se* unconstitutional, based on the Supreme Court's action in an appeal from the decision of the New York Court of Appeals, upholding a weighted-voting system, in *Franklin v. Krause,* 32 N.Y.2d 234, 344 N.Y.S.2d 885, 298 N.E.2d 68

(1973), *appeal dismissed,* 415 U.S. 904, 94 S.Ct. 1397, 39 L.Ed.2d 461 (1974). We noted that in *Franklin,* the first question presented to the Supreme Court by the appellants was " '[w]hether weighted voting is unconstitutional *per se* as a plan of permanent apportionment for a unicameral, County legislative body having general governmental powers.' " *League of Women Voters,* 737 F.2d at 164 (quoting appellants' Jurisdictional Statement). The Supreme Court dismissed the *Franklin* appeal for want of a substantial federal question. Such a dismissal constitutes a decision on the merits of the case. *See generally Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). Accordingly, in *League of Women Voters,* we followed the precedent set by *Franklin* and ruled that computerized weighted voting in a local legislative body with general governmental powers was not unconstitutional *per se.*

Given the concession by plaintiffs in the present case that under the weighting system used by the Delaware Board "each member casts a vote which is essentially proportionate to the population of his or her town," we regard the present action as one contending that weighted voting is *per se* unconstitutional. We reject that contention on the authority of *Franklin* and *League of Women Voters.* Plaintiffs' reliance on *Morris II* is misplaced. While *Morris II* indicated a preference for electoral districts of equal population, it did not foreclose the use of flexible systems with respect to the election of local officials, and it did not involve weighted voting.

■ Even had plaintiffs not conceded that the vote allocations made by Local Law No. 4 are essentially proportionate to the populations of the respective towns, we would uphold the district court's finding that the degree of deviation from the mean in the present case is *de minimis* and passes constitutional muster. While the Supreme Court has indicated, in cases that did not involve weighted voting, that there may be a maximum percent deviation beyond which no locality could justify the population disparities of its voting districts, *see, e.g., Mor-*

*ris II,* 489 U.S. at 702, 109 S.Ct. at 1442 ("[N]o case ... has indicated that a deviation of some 78% could ever be justified."), it has declined to set forth a definitive formula for measuring deviation on the local level. *See, e.g., Mahan v. Howell,* 410 U.S. 315, 329, 93 S.Ct. 979, 987, 35 L.Ed.2d 320 (1973) ("Neither courts nor legislatures are furnished any specialized calipers that enable them to extract from the general language of the Equal Protection Clause ... the mathematical formula that establishes what range of percentage deviations is permissible, and what is not."); *Roman v. Sincock,* 377 U.S. 695, 710, 84 S.Ct. 1449, 1458, 12 L.Ed.2d 620 (1964) ("[T]he problem does not lend itself to any such uniform formula, and it is neither practicable nor desirable to establish rigid mathematical standards for evaluating the constitutional validity of a state legislative apportionment scheme."). In *League of Women Voters,* we endorsed a method of calculating deviation from mean population that compared the percent of total population represented by a given local official to the percent of weighted votes allocated to that official, noting that such a measure was appropriate for "a complex weighted voting system" that allowed for the flexibility necessary to local governance. 737 F.2d at 171. In that case, we concluded that the resulting maximum deviation of 7.3% comported with the principle of population equality embodied in the one-person-one-vote rule.

Using that method in the present case, the district court properly concluded that Delaware County's system of distributing weighted votes among the members of the Board of Supervisors also comports with these constitutional standards. Local Law No. 4 allocates votes among Board members based strictly on the population represented by each Supervisor as shown by the 1990 census; voters from a given district thus may, in essence, elect a representative whose voting power on the Board is commensurate with the relative population of that district. As a result, there is only minimal deviation from population equality. The County's most overrepresented town, Andes, has 2.734% of the total population and 2.988% of the votes, resulting in a deviation of .25%. The most underrepresented town, Sidney, has 14.117% of the total population and 13.448% of the total Board votes, and is thus underrepresented by approximately .67%. The total deviation is .92%, a figure that is certainly within constitutional limits.

Further, it is undisputed that no one town has a majority of the county's population. Thus, although the representatives from the five largest towns could combine to effect passage of legislation by a simple majority, consistent with the aggregate population of their districts, no one representative controls a majority of the Board's weighted votes. Delaware County's apportionment plan therefore reproduces the relative voting power that would be achieved either by increasing the number of representatives per district in proportion to the population or by redrawing boundaries so that each district comprised a population of roughly equal size.

Finally, there is nothing in the record to indicate that Delaware County's weighted-voting system provides representation that is not qualitatively fair and effective. The Board's small size allows for the efficient conduct of county business and a greater degree of flexibility than would a Board of substantially greater size. By having each town elect a representative, the County assures that the interests of every town, no matter how small, are considered by the Board, and that no town suffers from permanent lack of representation on account of its size. In this way, the County's method of local governance preserves not only traditional boundaries and local allegiances, but assures that no voter is effectively disenfranchised by reason of place of residence. The district court properly concluded that these factors justify the minimal deviation resulting from implementation of Local Law No. 4 and that the County's use of its weighted-voting system is constitutional.

There being no genuine issue of material fact in dispute, summary judgment for the Board was properly granted.

## CONCLUSION

We have considered all of the standing and merits arguments presented by the plaintiffs

and have found them to be without merit. The judgment of the district court is affirmed.